IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 10-cv-02706-RBJ-MJW

RBK SPINE, LLC, a Michigan limited liability company,

    Plaintiff,

v.

LANX INC., a Delaware corporation,

    Defendant.

## ORDER

The case is before the Court on plaintiff's motion for partial summary judgment [docket #30] and defendant's motion for summary judgment [#31]. Both motions have been fully briefed. Neither party has requested oral argument. For the reasons set forth herein, the motions are denied.

### FACTS

The following facts are undisputed.

**The Agreement**.

RBK Spine, LLC entered into a "Distribution Agreement" (hereafter "Agreement") with Lanx, Inc. effective January 1, 2009 [#1-1]. The Agreement set forth the terms under which RBK would serve as a distributor of Lanx's medical devices in a portion of the State of Michigan during an initial term of three years.

The Agreement contains several terms that are key to the resolution of the pending motions and ultimately the case. These terms, quoted in whole or in pertinent part, are as follow:

Section 2.1(d)

Any breach of this Section 2.1 by Distributor shall be deemed a material breach of this Agreement. If Distributor fails to meet the DPQ (as defined in Section 3.5(c) for two (2) consecutive quarters during the Term, then Lanx shall have the right, in its sole discretion, to either (i) convert the exclusive appointment in Section 2.1(a) to a nonexclusive appointment upon written notice to Distributor or (ii) terminate this Agreement immediately upon written notice to Distributor pursuant to Section 11.2(c).

Section 3.5 (a).

Revenue Plan. . . . [O]n the fifth day of the last month prior to the end of the applicable calendar quarter, Distributor shall deliver to Lanx a revenue plan . . . .

Section 3.5(b)

Revenue Targets. Lanx shall have the right to establish the overall revenue targets for the upcoming quarter based on the Revenue Plan . . . .

Section 3.5(c)

DPQ. Based on the Revenue Plan, the parties hereby agree that the Distributor Performance Quota ("DPQ") shall be as follows for the period indicated: (a) For 2009, the DPQ shall be $5,400,000; and (b) for 2010 and 2011, the DPQ shall be Distributor's actual DPQ for the then most recently completed annual period (the "Target DPQ") plus an amount equal to (i) the Target DPQ multiplied by (ii) Lanx's target growth rate for such forthcoming annual period.

Section 11.2

Termination. (a) Material Breach. If the other party commits a material breach of this Agreement and fails to cure such breach within thirty (30) days from receipt of a written notice from the non-breaching party specifying such breach, the non-breaching party may terminate this Agreement with written notice effective upon receipt.

Section 12.8

Limitation of Liability. . . . LANX'S TOTAL LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT WILL NOT EXCEED THE AGGREGAGE AMOUNTS PAID BY LANX TO DISTRIBUTOR UNDER THIS AGREEMENT DURING THE PRECEDING TWELVE (12) MONTHS.

**RBK's Performance.**

As provided in section 3.5(c) of the Agreement, RBK's "Distributor Performance Quota" or "DPQ" for 2009, the first year of the three-year term, was set at total sales of $5,400,000. During the year, however, the parties entered into an "Amendment to Lanx, Inc. and RBK Spine, LLC Distribution Agreement Dated January 1, 2009" [#30-4] (the "Amendment") that reduced the DPQ for 2009 to $4,500,000.

RBK's sales for 2009 exceeded the DPQ as amended. However, Lanx also provided quarterly and monthly "quotas" in Exhibit C to the Agreement. This exhibit, entitled "Payment," indicates that RBK will be paid a base commission on sales, and that the base commission will be increased by 2% if RBK hits the quarterly quota.[1] The 2009 quarterly and monthly quotas were revised when the 2009 DPQ was revised in the Amendment [#30-4]. The amended quota for total sales for the fourth quarter of 2009 was $1,440,000. *Id.* at 3. RBK's fourth quarter sales did not meet that quarterly quota, even though, as indicated, it did meet the amended DPQ for 2009 as a whole.

By means of a March 3, 2010 email [#30-7] Lanx informed RBK of the DPQ ($5,327,379) it was establishing for 2010. This document also contained monthly and quarterly quotas for 2010. For the first quarter it showed quotas of $220,713 (January), $229,249 (February) and $342,158 (March), totaling $792,120 for the quarter. As of March 3, 2010 both parties already knew what RBK's actual sales had been for January ($147,962) and February ($155,711). RBK's total sales for March 2010 were $160,896, bringing its total sales of Lanx's

---

[1] The commission structure described in Exhibit C is somewhat more complicated than I have indicated, as it is broken down according to sales of products to two specified customers and other sales, but that level of detail is not material to the present motions.

products for the first quarter of 2010 to $464,569. This fell $181,262 short of meeting the quarterly quota set by Lanx on March 3, 2010.

On June 30, 2010 defendant sent an email and letter to plaintiff [#30-10] terminating the Agreement based upon plaintiff's failure to meet its DPQ for two consecutive quarters, specifically the fourth quarter of 2009 and the first quarter of 2010.

RBK asserts two claims, both based on breach of contract. First, it claims that it did not fail to meet the DPQ for two consecutive quarters. Complaint ¶¶33. Second, it claims that Lanx did not provide proper notice and an opportunity to cure the alleged breach. *Id.* ¶¶ 40-41.

**CONCLUSIONS**

RBK moves for partial summary judgment's motion for partial summary judgment establishing Lanx's liability on the First Claim, arguing that based upon undisputed facts, Lanx did not properly establish a quota for the first quarter of 2010. Lanx moves for summary judgment dismissing both claims. It argues that the RBK failed to meet quarterly quotas for two consecutive quarters, and that the opportunity to cure requirement of the Agreement either does not apply or, if it does, that RBK could not have cured its breach.

**A. Lanx's Motion for Summary Judgment [#31].**

Lanx's motion for summary judgment regarding the First Claim is based on the proposition that RBK failed to meet the quarterly quotas for two consecutive quarters, and therefore, that Lanx had the right immediately to terminate the Agreement under section 2.1(d) of the Agreement.

RBK's First Claim

Interestingly, the parties or at least counsel agree that Lanx has the authority to impose quarterly quotas. How one gets to that conclusion is not at all clear. Lanx has the authority under section 3.5(c) to set an annual quota. RBK met the annual quota, called the Distributor Performance Quota or DPQ, for 2009. The only place in the body of the Agreement where there is any reference to quarterly quotas is section 2.1(d) which states, "if Distributor fails to meet the *DPQ (as defined in Section 3.5(c)* for two (2) consecutive quarters during the Term, then Lanx shall have the right, in its sole discretion, to . . . terminate this Agreement immediately upon written notice to Distributor pursuant to Section 11.2(c)." (emphasis added). Strictly speaking this makes no sense. The DPQ is an annual quota. One cannot fail to meet an annual quota for two consecutive quarters.

Lanx implicitly argues that section 2.1(d) gives it discretion to break the annual DPQ down into quarterly quotas. RBK argues that Lanx's authority to impose quarterly quotas is found in section 3.5(b) of the Agreement which concerns "revenue targets."

Taking Lanx's theory first, even if section 2.1(d) gives Lanx discretion to set quarterly quotas, Lanx could not set the quotas in a manner that hinders RBK's ability to perform its obligations under the Agreement. Under Colorado law, "every contract contains an implied covenant of good faith and fair dealing." *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 498 (Colo. 1995). Under the implied covenant, when a contract grants a party discretionary authority, it may not exercise its discretion in a manner that defeats the reasonable expectations of the other party. *Ibid.* A breach of the covenant is a breach of the contract, even if the plaintiff has not

pled breach of the covenant in so many words. *See Denny Const., Incl. v. City and County of Denver,* 170 P.3d 733 (Colo. App. 2007), *rev'd on other grounds,* 199 P.3d 742 (Colo. 2009).

RBK has raised genuine issues of material fact that concern whether Lanx has exercised its discretion reasonably. For example, were the amounts of the fourth quarter 2009 and first quarter 2010 quotas consistent with the implied covenant? Was it consistent with the covenant to communicate the first 2010 quota to RBK after two thirds of the quarter had passed and the actual sales figures for the first two months were known? Was the large stocking order that Lanx urged RBK to complete in the fourth quarter of 2009 credited in a manner consistent with the covenant? Was it consistent with the covenant to wait until June 30, 2010 to notify RBK of the default and then not provide RBK with a 30-day period to attempt to cure the default? Was failure to meet the sales quotas for the two quarters a pretext for a termination decision that new management made for other reasons?

Moving on to RBK's theory, section 3.5(b) of the Agreement gives Lanx the right to establish "revenue targets for the upcoming quarter." RBK argues that the quarterly quota is the same as the quarterly revenue target and, therefore, it must be established before the upcoming quarter. Lanx protests that a "revenue target" is different from a "quota" and notes that section 2.1(d) does not refer to revenue targets in section 3.5(b) but instead to DPQ in section 3.5(c). It is not clear to this Court why a "revenue target" is different from a quota. Even Mr. Burney of Lanx, leading questions notwithstanding, struggled to explain how these sections fit together. *See* Burney Depo. [#30-2] at 125-27. I note that Exhibit C, which establishes the schedule for paying commissions to RBK, uses the word "quota" when talking about a quarterly totals that RBK must "hit" to qualify for increased commissions. This sounds something like a "target."

Interpretation of the meaning of terms of a contract is a matter of law for the Court. The Court concludes that the Agreement is ambiguous, both as to the source of Lanx's authority to set quarterly quotas and whether the quotas must be set before the quarter begins. An ambiguity in a contract will generally be resolved according to the intent of the parties. If the intent cannot be determined, then courts apply traditional "rules" of contract interpretation, for example, that ambiguities are generally resolved against the draftsman. The pending motions and briefs do not provide evidence concerning the intent of the parties on these issues. There is, for example, no evidence in the present record concerning whether or when quarterly revenue targets were actually set, whether they were different than the quarterly quotas Lanx established, and how they were used. There is no evidence in the present record specifically addressing the drafting of the Agreement, i.e., was it the product of actual negotiation with give and take between the parties, or was it essentially a form contract used by Lanx with its distributors?

The Court reserves judgment on these contract interpretation issues until it considers the evidence presented during the trial. If the Court concludes that revenue targets as described in section 3(b) are the same as quarterly quotas, then it will hold that because the quota was not established before the quarter began, it could not be used to support termination of the Agreement. If the Court agrees with Lanx that revenue targets are different, and that Lanx had discretion to impose the DPQ on a quarterly basis, then the jury will be asked to determine whether Lanx broke the contract by breaking the implied covenant of good faith and fair dealing.

RBK's Second Claim

Section 11.2(a) of the Agreement requires Lanx to provide written notice of a "material breach" and a 30-day period to attempt to cure the breach. RBK was not given 30 days to cure the alleged breach as required by section 11.2(a) of the Agreement. Lanx argues that because

section 2.1(d) authorizes immediate termination upon failure to meet quotas for two consecutive quarters, it was not required to provide an opportunity to cure. In any event, argues Lanx, RBK could not have cured the default even if the opportunity had been provided.

Section 2.1(d) expressly states that a breach of that section "shall be deemed a material breach." It goes on to say that if the distributor fails to meet the DPQ for two consecutive quarters, Lanx may "terminate this Agreement immediately upon written notice to Distributor pursuant to Section 11.2(c)." However, section 11.2(c) deals with a "major transaction bonus which has nothing to do with this case. This appears to be another example of questionable draftsmanship.

In this instance, because any other interpretation would make no sense, the Court holds as a matter of law that if RBK was in breach of section 2.1(d) of the Agreement by failing to meet properly established quotas for the last quarter of 2009 and the first quarter of 2010, then the termination procedure of section 11.2(a) was applicable. By definition a breach of section 2.1(d) would have been a "material breach. A "material breach" is governed by section 11.2(a) of the Agreement.

Whether RBK can establish causation, i.e., that it could have cured the alleged breach if given an opportunity to cure, is a disputed issue of fact. Both parties appear to agree that the only way the default could be cured is for RBK to have had sufficient sales during the 30-day cure period to make up the deficit. They also appear to agree that the amount of sales required to cure the default was $728,000. Because notice was given on June 30, 2010, the question is whether RBK can show to a preponderance of the evidence that it could have made up the deficit during the July 1 to July 30, 2010 time period. RBK has suggested that a hospital to which RBK sold a large stocking order in December 2009 had run out of inventory from that order and was

potentially in a position to place another large stocking order. That is a matter of speculation on the present record, but because Lanx has presented no evidence showing that RBK could not have made up the deficit, RBK does not have to do more to avoid summary judgment.

<u>Limitation of Liability Clause</u>

Finally, Lanx argues that even if its motion for summary judgment is otherwise denied, section 12.8 of the Agreement is not ambiguous. It provides that "Lanx's total liability arising out of or related to this agreement will not exceed the aggregate amounts paid by Lanx to distributor under this agreement during the preceding twelve (12) months." Lanx asks for a ruling that this term of the Agreement sets the limit on its potential liability.

RBK argues that this limitation is void as against public policy, citing *Rhino Fund, LLLP v. Hutchins,* 215 P.3d 1186 (Colo. App. 2008). However, in *Rhino Fund* the court recognized that courts generally uphold limiting provisions in contracts between sophisticated business entities that have negotiated their agreement at arm's length. *Id.* at 1191. Competent parties may contractually allocate business risks as they see fit. *Ibid.* Moreover, the issue in *Rhino Fund* was whether a contractual waiver of a corporate officer's personal liability extended to the officer's liability for the intentional torts of conversion and civil theft. The present case does not involve intentional torts.

*Rhino Fund* did acknowledge that "[m]ost courts will not enforce exculpatory and limiting provisions if they are unconscionable, if they result from unreasonable bargaining power, or if they purport to relieve parties from their own willful, wanton, reckless, or intentional conduct." *Ibid.* It is conceivable that, even in the case of business entities, a court could find a term of a contract to be unconscionable or the result of such unreasonable and uneven bargaining power that it could be deemed unenforceable. I doubt that that will be the case here. Even if this

contract is largely one of adhesion, it appears that RBK is a substantial and "sophisticated" business entity. It likely either had access to legal counsel or, at least, the means to obtain legal advice if desired. RBK's belief that Lanx acted in bad faith when it used RBK's failure to meet quarterly sales quotas as a pretext for terminating the Agreement is not the point with respect to the liability limitation. Rather, for the Court to throw out a clause to which RBK agreed, it would have to find a rather extraordinary degree of unfairness in the imposition of that clause that I am inclined to doubt can be shown.

Nevertheless, because neither party has squarely addressed that issue in its briefs, I will reserve judgment until I hear the actual evidence presented.

### B. RBK's Motion for Partial Summary Judgment [#30].

For the reasons set forth above with respect to Lanx's motion to dismiss RBK's first claim, the Court finds that there are genuinely disputed issues of material fact that preclude summary disposition of RBK's motion.

### ORDER

Motions #31 and 30 are DENIED.

DATED this 11th day of June, 2012.

BY THE COURT:

*[signature: Brooke Jackson]*

_____
R. Brooke Jackson
United States District Judge